IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | | |
|---|---|---|
| COLIN SUTTLES, | § | |
|     PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. 1:18-CV-1004-LY |
| | § | |
| FACEBOOK, INC., | § | |
|     DEFENDANT. | § | |

## **ORDER**

This case arises out of Plaintiff Colin Suttles's allegations that Defendant Facebook, Inc. violated the Telephone Consumer Protection Act by sending him several unsolicited text messages.

Before the court are Plaintiff Colin Suttles's Second Amended Complaint filed June 20, 2019 (Doc. # 30), Defendant Facebook, Inc.'s ("Facebook") Motion to Dismiss Plaintiff's Second Amended Complaint filed July 5, 2019 (Doc. #33), Suttles's Response filed July 24, 2019 (Doc. #39), Facebook's Reply filed August 16, 2019 (Doc. #43), United States of America's Memorandum of Law in Support of the Constitutionality of the Telephone Consumer Protection Act Of 1991 filed November 4, 2019 (Doc. #49), Facebook's Reply to the United States' Brief in Intervention in Support of the Constitutionality of the TCPA filed December 4, 2019 (Doc. #52), Facebook's Notice of Supplemental Authority and Developments filed January 29, 2020 (Doc. #55), Suttles's Response to Facebook's Notice of Supplemental Authority and Developments filed February 3, 2020 (Doc. #56), and Facebook's Notice of Supplemental Authority filed March 4, 2020 (Doc. #57).

Having reviewed the parties' pleadings and applicable law, the court now renders the following opinion and orders.

I.  **BACKGROUND**

On or about January 17, 2006, Suttles registered his cell-phone number ending in 6767 with the National Do Not Call Registry. Suttles alleges that beginning in 2014, Facebook sent 32 unsolicited text messages to Suttles from the numbers 320-99 and 326-65 that encouraged him and unknown third parties named "Hannah," "Abel," and "Sandra" to log on to facebook.com or provided verification codes assigned to those unknown third parties. Suttles asserts that Facebook used automated systems that ignored his text response to "STOP" after receiving the first text.

Suttles has a Facebook account but claims to have never provided his phone number or prior express consent to contact him via a text message or phone call. Suttles describes the text messages as "not personalized, contain[ing] random names, and always contain[ing] the same basic solicitation language, indicating a computer blasted advertisements to cell phone owners."

Suttles asserts that by sending the texts at issue, Facebook caused him actual harm, including the aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing text messages. Suttles also claims to have had to spend additional money to his phone service provider for receiving the texts.

Specifically, Suttles prays for the following relief: (a) an award of actual and statutory damages for each negligent violation of the Telephone Consumer Protection Act ("the Act"), *see* 47 U.S.C. § 227(b)(3)(B); (b) an award of actual and statutory damages for each knowing or willful violation of the Act, *see id.*; (c) an injunction requiring Facebook and its agents to cease all unsolicited telephone calling activities, *see* 47 U.S.C. § 227(b)(3)(A); (d) pre-judgment and post-judgment interest; (e) an award of reasonable attorney's fees and court costs; and (f) any other relief the court deems necessary, just, and proper.

## II. LEGAL STANDARD

A party may move to dismiss an action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In evaluating a motion to dismiss, the court must construe the complaint liberally and accept all of the plaintiff's factual allegations in the complaint as true. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2009).

Dismissal is proper when the facts alleged fail "to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or when "the complaint lacks an allegation regarding a required element necessary to obtain relief." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006). A plausible claim to relief must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

A complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. ANALYSIS

Suttles complains of two distinct violations of the Act. *See* 47 U.S.C. § 227. First, Suttles claims that Facebook repeatedly sent unsolicited "telephone solicitations" to Suttles's cell phone, whose number appears on the National Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c) ("Section 64.1200(c)"). Second, Suttles claims that Facebook sent text messages to Suttles's cell phone without prior consent using an automated-telephone-dialing system, after Suttles told Facebook to "STOP." *See* 47 U.S.C. § 227(b)(1)(A)(iii).

Though the Act does not explicitly reference text messaging, "a text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 667 (2016).

### a. Suttles's First Claim Fails Because He Does Not Allege That Facebook Sent A "Telephone Solicitation" Under the Act

Suttles alleges that Facebook sent him "telephone solicitations" in the form of text messages in violation of the Act. The starting point for interpreting a statute or regulation is its plain language. *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016). The statutory definition of a "telephone solicitation" is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(14). Therefore, to survive a motion to dismiss, Suttles must allege facts that indicate the text messages at issue were for that purpose. *See* § 64.1200(c). Suttles lacks this required element and consequently fails to state a claim upon which relief may be granted.

Suttles contends "that Facebook would want to recruit and encourage consumers like [him] to use the website and see advertisements, so Facebook can sell more ad space." By focusing on Facebook's advertising revenue, however, Suttles is effectively alleging that Facebook sent him text messages not to encourage *him* to purchase anything, but to affect Facebook's ability to encourage *others* to buy ads. But the Act does not prohibit Facebook from soliciting others to buy ad space; it prohibits encouraging the "telephone subscriber" to purchase property, goods, or services. *Id.* By alleging that Facebook sent Suttles text messages merely to help the company engage in commercial transactions with *others* who might purchase advertisements on the website's platform, he admits that Facebook was not soliciting *him*, as is required by the plain language of the Act.

4

Suttles responds that just because a sale is not completed during the text message does not mean the message is not a telephone solicitation. *In the Matter of Rules & Regulations Implementing the TCPA of 1991*, 20 FCC Rcd. 3788, 3804 ¶ 39 (F.C.C. 2005). But the invitations to visit facebook.com are insufficient to place the text messages within the plain-language definition of a "telephone solicitation" because they are not made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." *See* § 64.1200(c). Suttles's conclusory assertions about Facebook's business model lack the "specific factual allegations" needed to avoid dismissal. *Kan v. OneWest Bank, FSB*, 823 F. Supp. 2d 464, 468 (W.D. Tex. 2011). Suttles has provided no caselaw, and the court is unaware of any, that has held that an invitation to visit a website—even one whose business model is centered around user data—may be converted into a telephone solicitation within the meaning of Section 64.1200(c).

A message does not qualify as a "telephone solicitation" just because it may help a company sell advertisements to third-party businesses. *See, e.g., Alleman v. Yellowbook*, No. 12-CV-1300, 2013 WL 4782217, at *3, *6 (S.D. Ill. 2013). In *Yellowbook*, John Alleman alleged to have received the following unsolicited, prerecorded phone message on three separate occasions over the span of a year:

> Hi this is Yellowbook calling to verify that you received your Yellowbook phone directory. If you have not received the new directory or you'd like to request additional books, please contact Yellowbook at 1–888–492–8721 to speak to one of our customer service representatives again that number is 1–888–492–8721. Thank you for your time. Good bye.

*Id.* at *1. Similar to Suttles's argument, Alleman claimed the message violated the Act "because defendants sell ads to businesses [and] delivery of the directories results in defendants' direct financial benefit." *Id.* at *3. The *Yellowbook* court explained that "on its face," such messages do not "attempt to persuade or entice plaintiff to buy or invest in any commercially available product, good, or service." *Id.* at *4, *6. Under both the plain language of the Act and the logic

5

of *Yellowbook*, Suttles has failed to allege that Facebook's text messages were telephone solicitations because the "sale of goods or services is not advertised, promoted, contemplated, alluded to, or encouraged." *Id.* at *6. *Yellowbook*'s analysis is persuasive to this court.

Here, Suttles does not allege that Facebook initiated the text messages prompting "him to go to facebook.com or providing verification codes" to encourage Suttles to purchase or rent or invest in any of Facebook's property, goods, or services. Further, sales made by Facebook to its website visitors do not transform the messages received by Suttles into telephone solicitations. Other courts have found messages not to be telephone solicitations where the consumer is directed to a social-media website offering services for sale because the link between visiting a website and any possible purchase, rental, or investment was too attenuated. "An invitation to visit a social media site" lacks "the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services.'" *Suriano v. French Riviera Health Spa, Inc.*, No. 18-CV-9141, 2018 WL 6702749, at *3 (E.D. La. 2018); *see also Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1067 (C.D. Cal. 2017) (website allowing "consumers to engage in commerce does not transform any message including [the company's] homepage into telemarketing").

Facebook argues that Suttles's theory—that his mere login and use of Facebook's website in response to the text messages would result in a sale of his data to some unspecified third party or an amplified ability for Facebook to "sell more ad space"—is likewise incurably attenuated. The link between text messages urging a website visit and any possible purchase, rental, or investment is too weak to qualify as a telephone solicitation under the Act. The court agrees with Facebook that this is not merely a pleading error. Suttles cannot amend his complaint to state a claim upon which relief may be granted because Facebook's text messages are not "telephone solicitations" under the Act. Therefore, the court will dismiss this claim with prejudice.

### b. Suttles's Second Claim Fails Because He Does Not Adequately Allege That Facebook Used an Automated Telephone Dialing System Under the Act

Suttles alleges that Facebook sent him text messages using an automated-telephone-dialing system ("ATDS") in violation of the Act. *See* 47 U.S.C. § 227(b)(1)(A)(iii). Regardless of whether there is a "telephone solicitation," it is unlawful "to make any call . . . [without] prior express consent . . . *using any automatic telephone dialing system* . . . to any . . . cellular telephone." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

The Act is designed to address "abuses of telephone technology" by "telemarketers." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012). Congress found that, through telemarketers' placement of randomly and sequentially dialed spam calls, "telemarketing can be an intrusive invasion of privacy." 105 Stat. 2394, § 2(5) (1991). The portion of the Act most relevant to this case provides that:

> It shall be unlawful for any person within the United States, or any person outside of the United States if the recipient is within the United States (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) *using any automatic telephone dialing system* or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). The Act defines the term "automatic telephone dialing system" as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator; and . . . to dial such numbers." *Id.* at § 227(a)(1). The issue is whether, to qualify as an ATDS, a system must "produce" the numbers to be called or whether it is sufficient to "store" the numbers that it calls. The Federal Communication Commission ("FCC") historically interpreted an ATDS to be a device that stored numbers and possessed the potential to dial them automatically. The Fifth Circuit has not adopted an ATDS definition. Other circuits have conflicting definitions.

7

In 2018, the District of Columbia Circuit found both that the FCC had failed to "satisfy the requirement of reasoned decisionmaking" in addressing "which functions qualify a device as an autodialer," and that the Act cannot be interpreted so expansively as to sweep within its reach every smartphone user who makes an uninvited call. *ACA International v. FCC*, 885 F.3d 687, 703 (D.C. Cir. 2018); *see In re Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961 (F.C.C. 2015). The court limited the term's scope and "set aside . . . the [FCC's] effort to clarify the types of calling equipment that fall within the [Act]'s restrictions." *Id.* at 692. The court also vacated the FCC's prior "pertinent pronouncements" from 2003 and 2008 on what qualified as an ATDS because "[the FCC's] prior rulings left significant uncertainty." *Id.* at 701; *see In re Rules and Regulations Implementing the TCPA of 1991*, 23 FCC Rcd. 559 (F.C.C. 2008); *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14,014 (F.C.C. 2003).

Courts have uniformly held that *ACA International* set aside all of the FCC's interpretations of the definition of an ATDS and that interpreting the statutory definition of an ATDS must be done without FCC guidance.[1] The court finds the reasoned opinions of the Third, Eleventh, and Seventh circuits discussed below to provide the most persuasive construction.

---

[1] *See, e.g., King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) ("*ACA International* . . . invalidated [the 2015 FCC Order] and thereby removed any deference we might owe to the views the FCC expressed in it."); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) (declining to defer to any FCC order and recognizing that *ACA International* "set aside" the 2015 FCC Order, and that "[i]n light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the [the 2015 FCC Order's] issuance"); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 464 (7th Cir. 2020) ("the D.C. Circuit struck down the 2015 FCC interpretation in *ACA International*" and "did not leave prior FCC Orders intact"); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018) ("Because the D.C. Circuit exercised its authority to set aside the FCC's interpretations of the definition of an ATDS in the 2015 order and any prior FCC rules that were reinstated by the 2015 order, we conclude that the FCC's prior orders on that issue are no longer binding on us."); *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1310 (11th Cir. 2020) ("the D.C. Circuit, in a Hobbs Act proceeding of its own, wiped the slate clean" and "set aside the Commission's [interpretation of an ATDS]").

The Third Circuit has held that the adverbial phrase in the provision "using a random or sequential number generator" comes after a comma, and the phrase, therefore, modifies both the verbs "produce" and "store." *Elliot Coal Mining Co., Inc. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994) ("Th[e] use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase"); *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 150 (2012). Thus, an ATDS must either have the capacity to store telephone numbers to be called using a random or sequential number generator or produce telephone numbers to be called using a random or sequential number generator. *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) (finding that functionality of ATDS is "randomly or sequentially generating telephone numbers, and dialing those numbers").

The Eleventh Circuit recently agreed with the Third Circuit's interpretation that a device storing numbers without using a random or sequential number generator is not an ATDS. *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301 (11th Cir. 2020). *Glasser* also held that the Act requires an ATDS to randomly or sequentially generate numbers, not just dial them. *Id.* at 1309 ("In the age of smartphones, it's hard to think of a phone that does not have the capacity to automatically dial telephone numbers stored in a list, giving § 227 an 'eye-popping' sweep.").

On the other hand, the Ninth Circuit has read the Act "to provide that an ATDS is equipment which has the capacity—(1) to store numbers to be called *or* (2) to produce numbers to be called using a random or sequential number generator—and to dial such numbers." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018) (emphasis added). The court later clarified that "an ATDS need not be able to use a random or sequential generator to store numbers—it suffices to merely have the capacity to 'store numbers to be called' and 'to dial such

9

numbers automatically.'" *Duguid v. Facebook*, 926 F.3d 1146, 1151 (9th Cir. 2019). Though Suttles claims that Facebook used a "predictive dialer" that "dial[s] from a list of numbers" in his response to the motion to dismiss, Suttles does not plead facts suggesting that Facebook used a device with the capacity to dial stored numbers automatically in the live complaint. The court does not find the Ninth Circuit's statutory construction to be superior.

Most recently, the Seventh Circuit has adopted an ATDS interpretation in harmony with the Third and Eleventh Circuits. The Seventh Circuit held that a device must be capable of storing numbers using a random or sequential number generator or producing numbers using a random or sequential number generator to qualify as an ATDS. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 464 (7th Cir. 2020). *Gadelhak* further held that equipment that "dials numbers only from a customer database" is not an ATDS and explained that this interpretation "is certainly the most natural one based on sentence construction and grammar." *Id.* *Gadelhak* rejected the Ninth Circuit's interpretation because it "contort[s] the statutory text almost beyond recognition" and would require a "significant judicial rewrite" of the Act's plain text. *Id.* at 466. *Gadelhak* further opined that the Ninth Circuit's "ungrammatical" and expansive interpretation of an ATDS would have "farreaching consequences: it would create liability for every text message sent from an iPhone" and that such a result "makes little sense" when viewing the statute as a whole. *Id.*

The court agrees that a device must randomly or sequentially generate—not just store—numbers to be considered an ATDS under the Act.

Suttles's complaint alleges "telltale signs of an ATDS," namely that "he received multiple text messages of a commercial, non-personal nature, from an SMS short code number [a five- or six-digit phone number used to send and receive text messages], without consent, even after he requested that the messages stop." Suttles's response directs the court to many cases that suggest

that the use of an ATDS is reasonably inferable from similar—but distinguishable—factual allegations.[2] These decisions, Suttles argues, recognize the proper pleading standard, as well as "the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery." *Loveless v. A1 Solar Power, Inc.*, 2015 WL 4498787, at *3 (C.D. Cal. 2015). Facebook replies that pleading a "commercial" call without consent or continued calling after a request to stop, does not support an inference that a "random or sequential" functionality was used, because a commercial call does not suggest "random or sequential" functionality and continued calling weighs against an inference that an ATDS was used. *See Bader v. Navient Sols., LLC*, No. 18-CV-1367, 2019 WL 2491537 at *2 (N.D. Ill. 2019); *Snow v. General Electric Co.*, No. 18-CV-511, 2019 WL 2500407, at *4 (E.D.N.C. 2019). Suttles must provide at least enough facts to make a plausible inference that Facebook used an ATDS to survive dismissal. *See Twombly*, 550 U.S. at 570. To survive dismissal, the complaint "need not contain detailed factual allegations," but must provide more than conclusions. *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011).

---

[2] *See e.g., Flores v. Adir Int'l, LLC*, 685 Fed. Appx. 533, 2017 WL 1101103 (9th Cir. 2017) (use of ATDS reasonably inferable from facts that plaintiff received four identical text messages, *"none of the texts referenced plaintiff [or anyone else] directly,"* messages continued after plaintiff requested sender, defendant, to stop, text of messages were "generically formatted and appeared to be scripted," and texts were sent by "SMS short-code which are typically associated with automated services") (emphasis added); *Gerrard v. Acara Solutions, Inc.*, No. 18-CV-1041V(F), 2019 WL 2647758 (W.D.N.Y. 2019) (plaintiff's allegations that voluminous, non-personal text messages from defendant's business, *"who had no prior relationship with defendant,"* sent repeatedly to plaintiff, despite plaintiff's attempts to get defendant to stop them, supported a reasonable inference of defendant's use of ATDS) (emphasis added); *Krady v. Eleven Salon Spa*, No. 16CV5999MKBRML, 2017 WL 6542462 (E.D.N.Y. 2017) (complaint alleging thirty-six *"impersonal and generic"* text messages of a commercial nature without plaintiff's consent supports inference of ATDS use) (emphasis added); *Abbas v. Selling Source, LLC*, No. 09 CV 3413, 2009 WL 4884471 (N.D. Ill. 2009) (holding that plaintiff's complaint allowed the court to "reasonably infer" that defendant used an ATDS by alleging that defendant sent impersonal advertising messages *"without any personalization"* from a SMS short code) (emphasis added).

Suttles has pleaded the opposite of random or sequential dialing by alleging that he received *targeted* messages directed to him *and* "third parties" named "Hannah," "Abel," and "Sandra." Allegations of directly targeting specific individuals weigh against an inference that an ATDS was used. *See Snow*, 2019 WL 2500407, at *4 ("it is not reasonable to infer the messages were sent with equipment 'using a random or sequential number generator'" because messages were intended for "a targeted recipient" and thus "the facts alleged suggest the opposite."). The court concludes that the text messages at issue in this case—because they were addressed to Suttles, Hannah, Abel, and Sandra—militate against finding that Facebook used an ATDS.

A required element of this claim is that the text messages derived from an ATDS. Without it, the claim is fatally flawed. The court appreciates the difficulty Suttles faces in knowing the type of calling system used without the benefit of discovery, but the facts as they are already known suggest that an ATDS was not used. The facts as described in Suttles's pleadings do not give rise to an inference that a device with "random or sequential" functionality was used, but rather a device that directly targeted specific individuals. The court concludes that the ATDS definition employed by the Third, Seventh, and Eleventh Circuits is correct, and applying the definition defeats Suttles's claim that an ATDS was used. The court will, therefore, dismiss Suttles's second claim with prejudice.

IV.   **CONCLUSION**

Because Suttles's complaint does not allege claims upon which relief may be granted, the court need not address Facebook's arguments that the Act violates the First Amendment. *See Gomez v. United States*, 490 U.S. 858, 864 (1989) (courts are obligated "to avoid an interpretation" of statute "that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question."). Accordingly,

**IT IS ORDERED** that Facebook's Motion to Dismiss Plaintiff's Second Amended Complaint filed July 5, 2019 (Doc. #33) is **GRANTED**. All of Suttles's claims against Facebook are **DISMISSED WITH PREJUDICE**.

SIGNED this 20th day of May, 2020.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE